Case 4:25-cr-00271   Document 34   Filed on 06/11/25 in TXSD   Page 1 of 12

United States Courts
Southern District of Texas
**FILED**
*June 11, 2025*
Nathan Ochsner, Clerk of Court

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § | |
| § | |
| v. § | Criminal No. **4:25-cr-271** |
| § | |
| DAVID SIDWELL JENSON and § | |
| NESTOR RAFAEL ROMERO § | |
| MAGALLANES, § | |
| § | |
| Defendants. § | |

## SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES:**

At all times material to this Indictment:

### The Defendants and Related Entities and Individuals

1. Defendant DAVID SIDWELL JENSON ("JENSON") is a licensed podiatrist. JENSON owned and operated **David S. Jenson, DPM, PA** ("JDPM"), also doing business as **Jenson Foot & Ankle Specialists** and later as **Doctor's Inc.,** a podiatry clinic located in Shenandoah, Texas. JENSON and JDPM were enrolled in Medicare.

2. Defendant NESTOR RAFAEL ROMERO MAGALLANES ("ROMERO") worked with JENSON and JDPM and described himself as the CEO.

### The Medicare Program

3. The Medicare Program ("Medicare") was a federal healthcare program providing benefits to individuals who were over the age of 65 or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid

Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

4. Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

5. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

6. Physicians, clinics, and other healthcare providers were able to apply for and obtain a Medicare "provider number." A healthcare provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare identification number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider that ordered the services. When a claim was submitted, the provider certified, among other things, that:

    a. The contents of the claim form were true, accurate, and complete; and

    b. The claim form was prepared in compliance with the laws and regulations governing Medicare.

7. Medicare providers, such as JENSON, are required to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

2

8. Copayments set by Medicare were the monetary amounts or percentages paid by beneficiaries for health care services and items received. Medicare required participating providers to collect and make good faith efforts to collect copayments from beneficiaries at the time of billing. Medicare also specified that copayments could not be systematically waived or reduced, in part because consistent copayment collection was a fraud prevention measure—copayments gave beneficiaries financial incentives to reject medications and services that were not medically necessary or had little to no value to their treatments.

9. CMS does not pay Medicare claims submitted by Medicare providers directly. Instead, CMS contracts with different Medicare Administrative Contractors ("MACs") to administer the Medicare program throughout different parts of the United States. In Texas, the MAC with jurisdiction over Medicare Part B claims is Novitas. CMS also contracts with Qlarant, a Unified Program Integrity Contractor ("UPIC"), to review providers' claims for potential fraud, waste, and abuse within the Medicare and Medicaid program.

10. Medicare Part B regulations require physicians or other providers providing services to Medicare patients to maintain, for at least five years from the last encounter, complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting the actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the attending physician or clinic. These medical records are required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the physician under the Part B program.

**Medicare Coverage of Bioengineered Skin Substitutes**

11. Medicare providers are required to submit claims only for services that are

medically reasonable or necessary. 42 U.S.C. § 1395y(a)(1)(A). Medicare Part B providers also must specifically certify that services are medically necessary. 42 C.F.R. § 424.24(g)(1). Providers must also ensure that the services they furnish meet professionally recognized standards of care. 42 U.S.C. § 1320c-5(a)(2).

12. Medicare and its contractors promulgated Local Coverage Determinations ("LCDs") and other coverage documents to outline what specific services are deemed covered and non-covered by Medicare in a geographic location.

13. Medicare covered Bioengineered Skin Substitutes (hereinafter "Skin Substitutes"). LCD L35041 ("Application of Bioengineered Skin Substitutes to Lower Extremity Chronic Non-Healing Wounds") was the coverage document governing claims submitted in Texas for Skin Substitutes.

14. Skin Substitutes were utilized by providers to treat wounds. Wounds eligible for Skin Substitutes were defined by Medicare as partial or full thickness ulcers of the epidermis with a deficit of at least 1.0 square centimeters (cm) in size that are also clean and free of necrotic debris or exudate.

15. Skin Substitutes were allowed for patients who have a "chronic wound" with a "failed response." A "chronic wound" was defined as a wound that does not respond to standard wound treatment for at least a 30-day period during organized comprehensive conservative treatment. A "failed response" was defined as an ulcer or skin deficit that has failed to respond to documented appropriate wound-care measures, has increased in size or depth, or has not changed in baseline size or depth and has no indication that improvement is likely (such as granulation, epithelization, or progress towards closing).

4

16. Treatments utilizing Skin Substitutes were required to document at least the following information.

 a. Measurements of the initial ulcer, measurement at the completion of at least four weeks of appropriate wound care, and measurements immediately prior to placement and with each subsequent placement of the Skin Substitutes.

 b. Documentation of the wound having a failed response to standard wound care treatments.

 c. Clear documentation of the amount of utilized and wasted Skin Substitutes.

## COUNT ONE – CONSPIRACY TO COMMIT HEALTHCARE FRAUD
## (18 U.S.C. § 1349)

17. Paragraphs 1 through 16 are incorporated by reference.

18. From in or about January 2022 and continuing through in or about September 2024, in the Houston and elsewhere in the Southern District of Texas, the defendants

## DAVID SIDWELL JENSON
## and
## NESTOR RAFAEL ROMERO MAGALLANES

intentionally and knowingly did combine, conspire, confederate and agree with each other and others known and unknown, to violate Title 18, United States Code, Section 1347, that is, to knowingly and willfully execute and attempt to execute a scheme or artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

## The Purpose of the Conspiracy

19.     It was a purpose of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by, among other things, submitting and causing the submission of false and fraudulent claims to healthcare benefit programs, such as Medicare, and diverting proceeds of the fraud for the personal use and benefit of defendants and their co-conspirators.

## The Manner and Means of the Conspiracy

20.     The manner and means by which the defendants and their co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

a. JENSON and ROMERO caused the submission of false claims to Medicare for Skin Substitute services that were not medically necessary and not rendered as billed, which resulted in fraudulent billings to Medicare.

b. JENSON and ROMERO knew that the billing of Skin Substitutes was permissible only if a patient had a chronic non-healing wound which has failed to respond to conventional treatment for at least ten weeks.  Nevertheless, JENSON and ROMERO still submitted false claims to Medicare for providing Skin Substitutes to patients who did not have qualifying wounds, or who did not have wounds at all.

c. JENSON and ROMERO were warned in February 2023 that their billing was improper.  At that time, a set of JENSON's claims (including Skin Substitute claims) was reviewed by Qlarant, a Medicare contractor responsible for audits and identifying fraud, waste, and abuse.  All of the claims reviewed by Qlarant were denied.

d. JENSON received an "education letter" following that audit.  The education letter identified the claims that were denied, the reasons they were denied, and reminded him of the applicable Medicare requirements.

e. Nevertheless, JENSON and ROMERO continued to bill Medicare for Skin Substitutes after receipt of the "education letter"—often billing millions of dollars per month.

f. JENSON and ROMERO misrepresented the medically acceptable use of Skin Substitutes to their patients in order to secure consent to "use the Skin

6

Substitutes."

g. Among other things, JENSON and ROMERO claimed that the Skin Substitutes were "stem cells" used in the treatment of various ailments, including body pain or swelling. JENSON and ROMERO advertised that the Skin Substitutes would boost energy, increase growth factors in the body, and repair anything that is damaged within the body.

h. JENSON and ROMERO often misrepresented costs to patients. Patients were told that Medicare covered the services and there would be no copayment. ROMERO and others at the clinic would mark the Skin Substitute patients as non-billable to ensure that they were not pursued for copayments, which would have been thousands of dollars for each Medicare beneficiary.

i. JENSON and ROMERO maintained false medical records showing that patients had chronic, non-healing wounds when they did not, in fact, have any such wounds on their person.

j. JENSON and ROMERO would falsify records to make it appear that wounds were getting smaller with each subsequent visit.

k. JENSON and ROMERO applied Skin Substitute patches for certain patients on or shortly after their first visit, even though Medicare required ten weeks of prior unsuccessful conventional treatment prior to the use of Skin Substitutes on wounds.

l. JENSON and ROMERO also ensured that patients—including Skin Substitute patients—would be billed for multiple dates of service even though they had been to the clinic only once.

m. JENSON and ROMERO generated false medical records indicating that a patient had been seen on one date, and then again the subsequent morning. By falsifying the dates of service, JENSON and ROMERO were able to bill Medicare multiple times for a single office visit, thus obtaining additional money to which they were not entitled.

n. JENSON and ROMERO ensured that Medicare was regularly billed for the largest size of the Skin Substitute product. This practice violated Medicare requirements. Because reimbursement rates were impacted by the amount of the Skin Substitute used, Medicare required that providers document the amount of utilized and wasted Skin Substitute products. Medicare also required that providers use only what was necessary given the actual size of the wound.

o. Between in or around 2022 through in or around 2024, JENSON and ROMERO billed or caused to be billed over $90 million in claims to Medicare for Skin Substitute products, many of which were medically unnecessary. Medicare

7

    paid JDPM over $45 million on these claims.

p. JENSON and ROMERO shared the proceeds of the fraudulent billing, diverting funds to cryptocurrency, expensive jewelry and vehicles, and private jet travel.

q. JENSON and ROMERO attempted to, and did in fact, pressure patients into writing statements falsely indicating that they had wounds that would have qualified them for Skin Substitutes.  JENSON and ROMERO did this in the weeks following the execution of a federal search warrant, when they knew they were already under investigation by federal law enforcement officials.  JENSON and ROMERO even requested statements from patients who stated directly that they had scars, not wounds, and even though patients were led to believe that the "stem cells" were used for other purposes.  In at least one instance, JENSON scripted out, in word-for-word detail, the statement that he expected a patient to write.  JENSON did this knowing that government investigators would attempt to speak with and interview these patients and others as potential witnesses in the government's investigation, and in an effort to interfere with the government's ongoing investigation.

All in violation of Title 18, United States Code, Section 1349.

## **COUNTS TWO THROUGH THIRTEEN – HEALTH CARE FRAUD**
## **(18 U.S.C. §§ 1347 and 2)**

21.    Paragraphs 1 through 20 are incorporated by reference.

22.    On or about the dates listed below, in the Southern District of Texas and elsewhere, defendants

## **DAVID SIDWELL JENSON**
and
## **NESTOR RAFAEL ROMERO MAGALLANES**

along with others known and unknown to the grand jury, in connection with the delivery of and payment for health care benefits, items and services, did knowingly and willfully execute, did aid and abet one another to attempt to execute, and execute a scheme and artifice to defraud a health care benefit program affecting interstate commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control

of Medicare, all in violation of Title 18 United States Code, Section 1347.

23.     For the purpose of executing the scheme and artifice to defraud, , defendants aided and abetted on another to cause the transmission of the following false and fraudulent claims for Skin Substitute treatment to Medicare, which were for the beneficiaries, approximate dates, and claim amounts listed below:

| Count | Pt. | Claim Number | Date (on or about) | Medicare Amount Billed | Approximate Amount Paid |
|---|---|---|---|---|---|
| 2 | S.J. | 452824043778770 | 02/08/2024 | $95,710.00 | $73,535.62 |
| 3 | S.J. | 452924100391990 | 04/04/2024 | $95,710.00 | $62,746.61 |
| 4 | D.D | 452823164009280 | 06/09/2023 | $74,056.60 | $25,440.80 |
| 5 | D.D | 452223306099080 | 10/27/2023 | $45,150.00 | $20,229.26 |
| 6 | T.C. | 452923122669710 | 05/01/2023 | $74,056.60 | $25,440.80 |
| 7 | T.C. | 452823304006380 | 10/16/2023 | $45,800.00 | $20,229.26 |
| 8 | M.L. | 452923243328920 | 08/29/2023 | $45,256.60 | $18,554.24 |
| 9 | M.L. | 452224176201240 | 06/20/2024 | $95,710.00 | $62,746.61 |
| 10 | E.G. | 452223326458100 | 11/21/2023 | $114,096.40 | $88,787.18 |
| 11 | V.H. | 453223093611380 | 03/30/2023 | $74,056.60 | $25,440.80 |
| 12 | M.D. | 452224143853310 | 05/21/2024 | $95,710.00 | $62,746.61 |
| 13 | S.T. | 452223321443590 | 11/15/2023 | $45,150.00 | $20,229.29 |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNTS 14 THROUGH 15
**Engaging in a Monetary Transaction in Property Derived from Specified Unlawful Activity (18 U.S.C. §§ 1957 and 2)**

24.     Paragraphs 1 through 23 are incorporated by reference.

9

25. On or about the dates specified below, the exact dates being unknown, in the Southern District of Texas and elsewhere, defendant

# DAVID SIDWELL JENSON

aided and abetted by others, known and unknown to the grand jury, did knowingly engage in and attempt to engage in a monetary transaction by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from a specified unlawful activity, that is, Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349, as follows:

| Count | Approx. Date | Transaction | Approx. Amount |
|---|---|---|---|
| 14 | 12/13/23 | Wire Transfer of $800,000 from PNC Bank Account ending in *4329 to Coinbase account ending in *1085 | $800,000 |
| 15 | 3/20/24 | Wire Transfer of $1,000,000 from PNC Bank account ending in *4329 to Coinbase account ending in *1085 | $1,000,000 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF CRIMINAL FORFEITURE
### 18 U.S.C. § 982(a)(7); 18 U.S.C. § 981(a)(1)(C); and 28 U.S.C. § 2461(c)

Pursuant to Title 18, United States Code, Section 982(a)(7), the United States gives notice that upon a Defendant's conviction of any of the offenses charged in Counts One through Thirteen of this Superseding Indictment, the United States will seek forfeiture of all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offenses.

Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), the United States gives notice that upon a Defendant's conviction of any of the offenses charged in Counts One through Thirteen of this Superseding Indictment, the United States will seek forfeiture of all property, real or personal, which constitutes or is derived from proceeds traceable to such offenses.

## NOTICE OF CRIMINAL FORFEITURE
## 18 U.S.C. § 982(a)(1)

Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice that upon a Defendant's conviction of the offenses charged in Counts Fourteen through Fifteen of this Superseding Indictment, the United States will seek forfeiture of all property, real or personal, involved in money laundering offenses or traceable to such property.

## SPECIFIC PROPERTY SUBJECT TO FORFEITURE

Defendants are notified that the property subject to forfeiture includes, but is not limited to, the following specific property:

1. Approximately $13,245,943.56 in funds seized from a PNC Bank Account ending in *5118

2. Approximately $69,980,912.36 in USD Coin seized from a Coinbase Account ending in *1085

## MONEY JUDGMENT AND SUBSTITUTE ASSETS

The United States gives notice that it will seek a money judgment against each Defendant. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exist, the United States will seek to forfeit any other property of the Defendant up to the amount of the

money judgment against that Defendant.

A TRUE BILL

Original Signature on File
_____
FOREPERSON OF THE GRAND JURY

NICHOLAS J. GANJEI
United States Attorney
Southern District of Texas


By: *Brad R. Gray*
BRAD R. GRAY
KATHRYN OLSON
Assistant United States Attorneys
Southern District of Texas